| | | | |
|---|---|---|---|
| | AUSA: Myra F. Din | Telephone: | (313) 226-9100 |
| AO 91 (Rev. 11/11) Criminal Complaint | Special Agent: Gregory Waterson | Telephone: | (313) 226-3100 |

# UNITED STATES DISTRICT COURT
for the

Eastern District of Michigan

United States of America
    v.

Maurice Cross

Case No. Case: 2:22−mj−30047
Assigned To : Unassigned
Assign. Date : 1/31/2022
USA V. SEALED MATTER (CMP)(CMC)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __February 23, 2019 to present__ in the county of __Wayne__ in the __Eastern__ District of __Michigan__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire fraud |
| 18 U.S.C. § 1028 | Aggravated identity theft |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Gregory D. Waterson, DOL-OIG
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

_____
*Judge's signature*

Date: January 31, 2022

City and state: Detroit, Michigan

Hon. Kimberly Altman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Gregory Waterson, being duly sworn, depose and state that:

### I.     INTRODUCTION

1. I am a Special Agent of the U.S. Department of Labor, Office of Inspector General, and have been so employed since December 2015. I am currently assigned to the Detroit Field Office. Prior to this assignment, I was a Special Agent with the United States Secret Service for seven years. In the course of my employment as a Special Agent, I have conducted investigations concerning violations of Titles 18 and 29 of the United States Code. I have participated in a number of criminal investigations involving unemployment insurance (UI) fraud schemes.

2. The facts set forth in this affidavit include information that has been developed in furtherance of this investigation, as well as information provided by the State of Michigan Unemployment Insurance Agency. This affidavit is submitted for the purpose of showing that there is sufficient probable cause that Maurice CROSS (XX/XX/1981) has committed wire fraud in violation of 18 U.S.C. § 1343 and aggravated identity theft in violation of 18 U.S.C. § 1028A in order to conduct unemployment insurance fraud, and does not contain all facts known to law enforcement regarding this investigation.

## II. BACKGROUND

3. The Social Security Act of 1935 initiated the federal and state unemployment insurance system, which was designed to provide benefits to individuals who are unemployed for reasons beyond their control. The amount paid to the claimant depends on a variety of factors, including the length of the claimant's previous employment and the amount of wages earned.

4. The unemployment insurance program is a federal benefits program administered for the federal government by the state workforce agencies in each state. In Michigan, the unemployment insurance system is administered for the federal government by the Michigan Unemployment Insurance Agency (MUIA). A substantial amount of MUIA's funds are provided for by the Federal American Recovery and Reinvestment Act, Emergency Unemployment Compensation Act, and/or are otherwise federally subsidized through the United States Department of Labor. The U.S. Department of Labor funds all administrative costs, including salaries, office expenses, and computer equipment. Unemployment insurance benefits paid to unemployed workers in the private sector are financed by taxes on the employers. If the funds collected from the employers (through taxes) by MUIA are exhausted, they can be supplemented by federal funds appropriated by the United States Department of Labor to ensure that claimants receive their unemployment insurance benefits.

5. Normally, an unemployment insurance claim is initiated by a claimant submitting an application to MUIA in person, over the telephone, or via the internet.

6. To receive benefits, a claimant is required to provide certain information to MUIA, including the claimant's name, mailing address, driver's license number, phone number, social security number, date of birth, etc. This information is used to confirm the claimant's identity, determine the claimant's last employer, and determine the claimant's earnings as reported by that employer.

7. The claimant can file an initial claim via MUIA's website. When the claimant files an initial claim via MUIA's website, the claimant creates a web account including a unique username and password that the claimant subsequently enters each time he or she visits MUIA's website to make changes or additions to the claimant's information.

8. In order to be eligible for unemployment insurance benefits, the claimant must demonstrate a certain level of earnings, in several quarters, preceding the application. This information is normally provided to MUIA by the claimant's last employer.

9. MUIA also notifies the claimant's last employer of the claim for benefits. Because unemployment insurance claims could adversely affect an employer's tax account, the employer is entitled to provide separation information that could affect payment to the claimant. If MUIA does not receive a response to the notice from

the employer within 10 calendar days from the date of mailing, the claim is approved without protest.

10. After MUIA accepts an unemployment claim, it transfers the initial unemployment benefits as directed by the claimant, who can select from a personal account associated with a bank, a prepaid debit card, or an unemployment insurance debit card. If the claimant directs the payment to an unemployment insurance debit card, MUIA opens an account in the claimant's name at Bank of America (BOA). BOA then mails a debit card issued in the claimant's name to the address provided to MUIA by the claimant. UI funds are sent via wire from Michigan and processed through BOA (which handles all Michigan UI processing), specifically through BOA data centers locations in the states of Virginia and Texas. These data centers also process any account transactions, including withdrawals from Automated Teller Machines (ATMs).

11. After the initial application, in order to receive continued benefits, claimants are required to contact MUIA every two weeks by telephone or internet in order to certify they are still unemployed and actively seeking work. Claimants who complete this certification by internet do so using the username and password they originally established with MUIA.

### III.   PROBABLE CAUSE

12.   In February 2019, MUIA contacted federal investigators.  A single Internet Protocol (IP) address, 73.145.84.70, was identified filing, accessing, and/or making changes to dozens of UI claims. Based on my training and experience, a single IP address filing, accessing, and/or making changes to dozens of UI claims is an indication of fraud because it is unlikely that dozens of individuals reside at a single address (let alone are all eligible to file UI claims).  This IP address had been filing, accessing, and/or making changes to UI claims between December 2018 and January 2019.

13.   MUIA determined that the Internet Service Provider (ISP) for the IP address was Comcast.  Comcast provided the subscriber information for IP address 73.145.84.70.  The subscriber was identified as E.E.  E.E.'s address was listed as XXXX9 Dale Street, Detroit, MI 48233 (the "Dale Street residence").  The phone number listed on the subscriber's account was XXX-XXX-0183.

14.   In March 2019, MUIA identified a different IP address, 107.214.78.11, that was used to file, access, and/or make changes to dozens of UI claims between January 2019 and March 2019.  As stated above, based on my training and experience, an IP address filing, accessing, and/or making changes to dozens of UI claims is an indication of fraud.

5

15.     MUIA determined that the ISP for IP address 107.214.78.11 was AT&T. AT&T provided the subscriber information for 107.214.78.11. The subscriber was identified as L.H. L.H.'s address was also listed as XXXX9 Dale Street, Detroit, MI 48223, the same address listed for E.E. above. The phone number listed on the subscriber's account was also XXX-XXX-0183, the same number referenced above.

16.     According to a law enforcement database, phone number XXX-XXX-0183 was issued to Maurice CROSS.

17.     According to a law enforcement database, CROSS was associated with several addresses within the Detroit, MI metro area. One address was XXXX0 Virgil Street, Detroit, MI 48223.

18.     According to a law enforcement database, XXXX0 Virgil Street, Detroit, MI 48223 was also a registered address for an individual identified herein as "Individual A." A law enforcement database check revealed that Individual A had a registered vehicle that was a 2010 Chevy Traverse MI license plate DZQ0029.

19.     Based on the information provided by Comcast, IP address 73.145.84.70 first became active at the Dale Street residence in or around December 2018. Based on the information provided by AT&T, IP address 107.214.78.11 first became active at the Dale Street residence in or around February 2019. According to MUIA, both IP addresses filed and/or accessed fraudulent UI claims. On or about February 2019, surveillance was conducted at the Dale Street residence. A red Chevy Traverse with

MI license plate DZQ0029 was seen parked in the driveway. As noted above, this vehicle was registered to Individual A. Based on this information, it appears that CROSS and Individual A began residing at the Dale Street residence in or around December 2018.

20. On or about May 2019, MUIA's Fraud Division provided me with a list of UI claims that had been filed and/or accessed by the IP addresses registered to the Dale Street residence. I reviewed this information and determined that the IP addresses registered to the residence had filed and/or accessed approximately 54 separate UI claims between December 2018 and March 2019. Of these 54 separate claims, approximately 10 had been successfully processed and paid by MUIA. As explained above, based on my training and experience, this many separate UI claims being filed and/or accessed from a single IP address is an indication of the existence of fraudulent claims.

21. On or about May 2019, MUIA's Fraud Division provided me with ATM footage of withdrawals from debit accounts where funds were deposited for UI claims successfully filed from the Dale Street residence. A review of the ATM footage from three of these accounts (identified herein as U.T., A.C., and S.B.) showed an individual very strongly resembling CROSS making withdrawals from accounts associated with U.T., A.C., and S.B. The individual in the footage was compared to CROSS's State of Michigan driver's license photo. In each series of

7

ATM footage referenced in this paragraph, CROSS appears to be in or near a red Chevy Traverse. None of the ATM footage is clear enough to make out the vehicle's license plate.

22. On or about May 2019, surveillance was conducted at the Dale Street residence. A red Chevy Traverse with MI license plate KEEPER7 was seen parked in the driveway. A law enforcement database check revealed that Individual A had re-registered the 2010 Chevy Traverse with MI plate DZQ0029 in April 2019. The new license plate was KEEPER7. A dark colored Chevy sedan was also seen parked in the driveway. This sedan had MI plate DZQ0029 attached.

23. On May 29, 2019, a federal search warrant was issued for the Dale Street residence and the red Chevy Traverse with MI plate KEEPER7.

24. On May 30, 2019, Agents with the DOL-OIG, Department of Homeland Security, Detroit Police Department, and Regulation Agents with MUIA executed the federal search warrant at the Dale Street residence. Upon arrival at the residence, Agents knocked on the door and announced their presence. Individual A answered the door and informed Agents that CROSS was in a rear bedroom. Agents called for CROSS to exit the bedroom, but CROSS did not immediately exit the bedroom. Agents made entry into the residence and continued to call for CROSS to exit the bedroom. After approximately 30 seconds, Agents encountered CROSS exiting the bedroom. CROSS was placed in handcuffs while Agents finished clearing the

residence. After the residence was cleared, Agents removed CROSS's handcuffs, and he and Individual A were seated on the living room couch for the duration of the search warrant.

25. Agents conducted a search of the residence and found the following items:

- 8 UI debit cards associated with UI benefit claims in the names of individuals not residing at the Dale St residence.

- Handwritten notes and MI driver's license printouts from the State of Michigan's Department of State database. These notes and printouts contain personal identifying information of over 400 individuals not residing at the residence, including dates of birth, social security numbers, addresses, phone numbers, and driver's license numbers.

- Several electronic items that CROSS admitted belonged to and were used by him, including several phones, an iPad, and a thumb drive.

26. During the execution of the search warrant, CROSS agreed to be interviewed. CROSS was informed that UI claims, using stolen identities, had been filed from the Dale Street residence. CROSS admitted to his involvement in a UI fraud scheme, also involving several other individuals. CROSS reviewed ATM photos of withdrawals from debit accounts where funds were deposited by the State of Michigan from UI claims and identified himself in the photos making withdrawals. However, CROSS claimed that he was not involved with the filing of the fraudulent

9

UI claims, not even the claims that were filed from the Dale Street residence. CROSS claimed that his co-conspirators came over to his residence and used the internet to file the claims, often without his knowledge. CROSS acknowledged that he knew that what he was doing was wrong because the debit cards had the victims' names on them. CROSS also admitted that MUIA mailings came to both the Dale Street residence and XXXX0 Virgil Street. CROSS also admitted that Agents would find PII in his bedroom. CROSS claimed that this PII was given to him to "hold" by his co-conspirators because "things had gotten too hot." CROSS claimed that his co-conspirators were obtaining the PII from an individual who worked "downtown" and could access individuals' PII.

28. The PII seized by Agents from CROSS's bedroom, and that CROSS admitted was his, included the MI driver's license printouts from the State of Michigan's Department of State database for E.E. (referenced in paragraph 13 above) and L.H. (referenced in paragraph 15 above).

28. The eight UI debit cards found in the Dale Street residence all had unemployment benefits deposited on them. Also found with the debit cards were ATM receipts showing three of the cards had recently been used to make cash withdrawals.

29.    Three of the UI debit cards were in the names of individuals herein identified as L.C., D.W., and U.T.  U.T. is referenced above.  L.C.'s, D.W.'s, and U.T.'s PII were found on MI driver's license printouts seized from the residence.

30.    According to MUIA, on January 11, 2019, a UI claim was filed in victim L.C.'s name from the Dale Street residence's IP address.  According to MUIA, claim payments were authorized on L.C.'s fraudulent claim beginning on January 12, 2019.  According to the records provided by BOA, the account associated with L.C.'s UI claim first began receiving funds on January 29, 2019.  The ATM footage obtained showing the withdrawals made from L.C.'s debit account appears to show CROSS withdrawing funds on March 6, 2019 and April 3, 2019.  During the withdrawal on March 6, 2019, CROSS was seen driving a red Chevy Traverse.  According to MUIA, $4,448.00 was paid into the BOA account opened in L.C.'s name and withdrawn.  As outlined in paragraph 29, L.C.'s PII, in the form of a MI driver's license printout, was found at CROSS's residence.  On or about April 22, 2020, L.C. filed a signed Statement of Identity Theft with MUIA.  In the Statement, L.C. confirmed that he/she had not filed an unemployment insurance claim with MUIA and had not authorized anyone to file a claim on his/her behalf.

31.    According to MUIA, on January 15, 2019, a UI claim was filed in victim D.W.'s name.  While it appears that the claim was filed using a cellular phone connection, D.W.'s UI web account was accessed using an IP address registered to

11

the Dale Street residence on February 12, 2019. According to MUIA records, the address provided for D.W.'s claim was XXXX0 Virgil Street, Detroit, MI 48223—an address associated with CROSS and Individual A. According to MUIA, claim payments were authorized on D.W.'s fraudulent claim beginning on January 19, 2019. According to the records provided by BOA, the account associated with D.W.'s UI claim first received funds beginning on January 30, 2019. The ATM footage obtained showing the withdrawals made from D.W.'s debit account appears to show CROSS withdrawing funds on February 6, 2019, February 13, 2019, March 13, 2019, and March 29, 2019. During the withdrawal on February 13, 2019, CROSS was seen driving a red Chevy Traverse. During his interview on May 30, 2019, CROSS was shown several photographs from the ATM surveillance footage showing withdrawals made from the debit account associated with D.W. CROSS identified himself in several of the photographs. According to MUIA, $5,430.00 was paid into the BOA account opened in D.W.'s name and withdrawn. As discussed in paragraph 29, D.W.'s PII, in the form of a MI driver's license printout, was found at CROSS's residence.

32. According to MUIA, on February 20, 2019, a UI claim was filed in victim U.T.'s name from the Dale Street residence's IP address. According to MUIA records, the address provided for U.T.'s claim was that of the Dale Street residence. According to MUIA, claim payments were authorized on U.T.s' fraudulent claim

12

beginning on February 23, 2019. According to the records provided by BOA, the account associated with U.T.'s UI claim first received funds beginning on March 6, 2019. The ATM footage obtained showing the withdrawals made from U.T.'s debit account appears to show CROSS withdrawing funds on March 8, 2019. A red Chevy Traverse is seen parked in the background. CROSS was again seen withdrawing funds from an ATM on March 20, 2019. During his interview on May 30, 2019, CROSS was shown several photographs from the ATM surveillance footage showing withdrawals made the debit account associated with U.T. CROSS identified himself in several of the photographs. According to MUIA, $1974.00 was deposited into the BOA account opened in U.T.'s name and withdrawn. As outlined in paragraph 29, U.T.'s PII, in the form of a MI driver's license printout, was found at CROSS's residence.

33. According to MUIA, 42 successfully filed fraudulent claims have been associated with the PII seized from the residence, with the total loss amount of $96,380.00. 94 fraudulent UI claims in total had been filed using the PII seized from the residence. Of the 42 successfully filed fraudulent claims, approximately 22 (totaling $70,654.00 in actual loss) appear reasonably attributable to CROSS. However, CROSS was in possession of PII for the individuals associated with all 42 successfully filed claims.

34. In June of 2019, a second federal search warrant was issued for the electronic devices seized during the execution of the federal search warrant at the Dale Street residence on May 30, 2019.

35. A review of forensic analysis reports for CROSS's electronic devices revealed hundreds of additional victims' PII, photographs of several BOA UI debit cards, and other various items that appear to be related to unemployment insurance fraud. The web browsing history and bookmarked websites on an iPhone and iPad seized during the execution of the search warrant at the Dale Street address revealed that the devices were used to visit MUIA's claim website. Based on the totality of evidence, it appears that CROSS's claim that he did not file fraudulent UI claims, and that co-conspirators used his internet connection to do so, was not truthful. There is probable cause to believe that CROSS filed fraudulent UI claims himself (using victims' PII that he had obtained), shipped and received fraudulently obtained BOA UI debit cards, and then withdrew cash from ATMs using the fraudulently obtained BOA UI debit cards issued in victims' names. CROSS used the unauthorized debit cards to make over $1,000.00 in cash withdrawals from ATMs in the Eastern District of Michigan.

## IV. CONCLUSION

36. There is probable cause to believe that Maurice CROSS has committed wire fraud in violation 18 U.S.C. § 1343 and aggravated identity theft in violation of 18 U.S.C. § 1028A in order to conduct unemployment insurance fraud.

Respectfully submitted,

_____
GREGORY D. WATERSON
Special Agent, DOL-OIG

Subscribed before me and signed in my
presence and/or by reliable electronic means.

_____
Hon. Kimberly Altman
United States Magistrate Judge

Dated: January 31, 2022